IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ETHEL ADELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | CASE NO. 3:10-CV-122-WKW [WO] |
| | ) | |
| MACON COUNTY GREYHOUND | ) | |
| PARK, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, all 853 of them, collectively bet millions of dollars playing electronic bingo machines at Victoryland in Macon County, Alabama.  In the end, the machines made losers of them all.  Now, they are betting on better odds in this federal lawsuit in which they seek to get back their lost wagers and more.  They venture to do so under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and a 150-year-old Alabama statute that voids gambling contracts, Alabama Code § 8-1-150.  Defendants, to include Victoryland's president and the machine manufacturers, call Plaintiffs' bluff in Rule 12(b)(1) and (b)(6) motions to dismiss, contending that the legal odds are on their side.  *See* Fed. R. Civ. P. 12(b)(1) & (6).

Pending are six motions to dismiss filed by Defendants (1) Multimedia Games, Inc. (Docs. # 57-58), (2) Cadillac Jack, Inc. (Docs. # 59-60), (3) IGT, Inc. (Docs. # 61-62), (4) Nova Gaming, LLC (Docs. # 63-64), (5) Bally Gaming, Inc. (Docs. # 65-66), and (6) Macon County Greyhound Park and Milton E. McGregor (Docs. # 67-68).  Plaintiffs filed

a consolidated response to the six motions to dismiss (Doc. # 80), to which Defendants replied (Docs. # 82-89).[1]  Plaintiffs filed a surreply.  (Doc. # 92.)

After careful consideration of the arguments of counsel, the law and the Complaint's allegations, the court finds that the motions are due to be granted on the RICO claim for failure of Plaintiffs to plead 18 U.S.C. § 1964(c)'s standing requirements, and denied on the § 8-1-150 claim.[2]

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction over the RICO claim is exercised pursuant to 28 U.S.C. § 1331.  Plaintiffs predicate subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), (d)(11)(A), and (d)(11)(B)(i).  (Compl. ¶ 14.)  Personal jurisdiction and venue are not contested, and there are adequate allegations of both.

## II.  STANDARD OF REVIEW

### A.   Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8:  "a short and plain statement of the claim showing that the

---

[1] Given the numerous briefs filed in support of and in opposition to the motions to dismiss, the filings are cited herein by using the docket numbers assigned to the documents in the court's electronic filing system.  The Complaint is cited as "Compl."  (Doc. # 1.)

[2] An order ruling on Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss also has been entered this date in a case of a similar nature.  *See Bussey v. Macon County Greyhound Park, Inc.*, No. 3:10cv191 (M.D. Ala. filed March 31, 2011).  In *Bussey*, the plaintiffs also lost money playing electronic bingo at Victoryland, and have sued to recover those losses under § 8-1-150 of the Alabama Code.  With one exception, the named defendants are the same in this action as in *Bussey*.  *Bussey* is not an identical suit, however.  *Bussey* was filed as a class action, and early on the RICO claim was voluntarily dismissed by the plaintiffs.  In *Bussey*, as here, the § 8-1-150 claim survived the motions to dismiss.

pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2).  When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (brackets added; citation omitted).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard also "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim.  *Twombly*, 550 U.S. at 556.  While the complaint need not set out "detailed factual allegations," it must provide sufficient factual amplification "to raise a right to relief above the speculative level."  *Id.* at 555; *see also James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (*Twombly* formally retired "the often-criticized 'no set of facts' language previously used to describe the motion to dismiss standard." (citation omitted)).

3

In the Eleventh Circuit, where the substantive RICO violations are based upon fraud, the "allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010); *see also Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity."). In this context, Rule 9(b) requires a plaintiff to allege "'(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud.'" *Am. Dental Ass'n*, 605 F.3d at 1291 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

## B.   <u>Rule 12(b)(1)</u>

A Rule 12(b)(1) motion to dismiss may assert either a factual or facial attack on subject matter jurisdiction. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007); *accord Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Lawrence*, 919 F.2d at 1529 (internal quotation marks omitted). A facial attack, on the other hand, "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *McElmurray*, 501

4

F.3d at 1251 (quoting *Lawrence*, 919 F.2d at 1529).   Because the allegations in the "complaint are taken as true" on a facial Rule 12(b)(1) motion, it provides a plaintiff "safeguards similar to those retained when a Rule 12(b)(6) motion is raised."   *Id.* (citation and internal quotation marks omitted).

## III. BACKGROUND

### A.    Parties

At all times material to this litigation, Defendant Macon County Greyhound Park ("MCGP") offered pay-to-play electronic bingo machines to the public at its facility in Macon County, Alabama, under the names Victoryland and Quincy's 777.[3]   (Compl. ¶ 3.) MCGP is an Alabama corporation, which is "owned, in whole or in part" by its president and chief operating officer, Defendant Milton McGregor ("McGregor").   (Compl. ¶¶ 3-4.) MCGP "conduct[s] the day-to-day operations of Victoryland."   (Compl. ¶ 72; *see also* Compl. ¶¶ 3, 39.)

The other Defendants are out-of-state manufacturers of the electronic bingo machines available for play at Victoryland.  Multimedia Games, Inc. ("MMG") is a Texas corporation; Cadillac Jack, Inc. ("Cadillac Jack") is a Georgia corporation; Nova Gaming, LLC ("Nova") is a South Carolina corporation; and IGT, Inc. ("IGT"), and Bally Gaming, Inc. ("Bally") are

---

[3] For ease of reference, Victoryland and Quincy's 777 are referred to together as "Victoryland."

Nevada corporations (collectively "Manufacturers").[4] (Compl. ¶¶ 5, 6, 7, 10, 11.) Plaintiffs allege that these Defendants collectively participated in the design, marketing, promotion, and operation of "illegal gambling operations" at Victoryland by offering electronic bingo machines to the public.[5]  (Compl. ¶¶ 3-12.)

Plaintiffs consist of 853 individuals who spent "millions of dollars" playing electronic bingo machines at Victoryland during the one-year period preceding the filing of the Complaint.  (Compl. ¶¶ 3, 20, 22, 38.)  Each Plaintiff asserts that his or her damages, "individually and standing alone[,] exceed $75,000."  (Compl. ¶ 15.)  The majority of Plaintiffs are Alabama citizens; fewer than eighty Plaintiffs are citizens of other states. (Compl. ¶¶ 1-2.)

**B.    Amendment No. 744**

The commencement of electronic bingo at Victoryland has as its origin Amendment No. 744.  (*See* Compl. ¶ 39 ("Defendants claimed that their operation [of electronic bingo at Victoryland] was and is within the parameters of local amendment 744 to the Alabama Constitution.").  In June 2004, Amendment No. 744 to the Alabama Constitution was ratified, having been approved by a majority of the qualified electors in Macon County.

---

[4] At this stage, there are only allegations, and the facts are not developed as to the business relationships among the various Defendants or as to the nature of MMG's, Cadillac Jack's, Nova's, IGT's and Bally's activities in connection with the electronic bingo operations at Victoryland.  Accordingly, in this opinion, MMG, Cadillac Jack, Nova, IGT and Bally are referred to collectively as "Manufacturers" for the sake of convenience and not as a term of legal significance.

[5] Upon Plaintiffs' motion, Defendants Colossus, Inc., and Rocket Gaming Systems, LLC, were previously dismissed without prejudice.  (Docs. # 56, 81.)

(Compl. ¶ 16); *see* Ala. Const. 1901 amend. No. 744.  The constitutional amendment permits "[t]he operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes."  Ala. Const. 1901 amend. No. 744.  The sheriff of Macon County is charged with "promulgat[ing] rules and regulations for the licensing and operation of bingo games within the county."  *Id.*  The sheriff of Macon County also is charged with enforcement of Amendment No. 744.[6]  *Id.*  Amendment No. 744 contains the following regulatory requirements:

> (1)  No person under the age of 19 years shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 years be permitted to conduct or assist in the operation of any game of bingo.
> (2)  No bingo license shall be issued to any nonprofit organization, unless the organization shall have been in existence for at least three years in the county immediately prior to the issuance of the permit or license.
> (3)  Bingo games may be operated on the premises owned or leased by the nonprofit organization operating the bingo game.
> (4)  A nonprofit organization may enter into a contract with any individual, firm, association, or corporation to have the individual or entity operate bingo games or concessions on behalf of the nonprofit organization.  A nonprofit organization may pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.
> (5)  A nonprofit organization may lend its name or allow its identity to be used by another person or entity in the operating or advertising of a bingo game in which the nonprofit organization is not directly and solely operating the bingo game.

---

[6]  Plaintiffs emphasize that Amendment No. 744 does not contain the word "electronic" (Compl. ¶¶ 16-17), while Defendants emphasize that the sheriff's regulations do (Doc. # 74, at 15; Doc. # 68, at 10).

(6) Prizes given by any nonprofit organization for the playing of bingo games shall not exceed the cash amount or gifts of equivalent value set by rule or regulation during any bingo session during any calendar week.

*Id.*

A theme that reverberates throughout the Complaint is that the operation of electronic bingo machines at Victoryland contravenes Amendment No. 744. More specifically, Plaintiffs argue that the bingo machines are aided by prohibited "electronic devices" (Compl. ¶ 17), that MCGP and Mr. McGregor operate a "substantial for profit operation which generates income well in excess of the reasonable consulting fee" (Compl. ¶ 26), that MCGP and Mr. McGregor "pa[y] crumbs to nonprofit organizations who actually own[ ] licenses for the operation of bingo games" (Compl. ¶ 30), and that MCGP and Mr. McGregor, as operators of the electronic bingo machines, "entered into contracts with third parties, including the [Manufacturers] . . . , for providing . . . electronic gaming machines, in exchange for payment of monies or the sharing of profits (Compl. ¶ 39c), all in violation of Amendment No. 744. Because Victoryland's electronic bingo machines allegedly run afoul of Amendment No. 744, Plaintiffs contend that the machines "are, in fact, 'slot machines' . . . which violate the criminal provisions of Alabama law, including but not limited to, §§ 13(a)-12-20(10) and 13(a)-12-27." (Compl. ¶ 32.)

Against this backdrop, the court turns to the factual contentions in the Complaint.

C.   **Facts Alleged**[7]

Following ratification of Amendment No. 744, and at least as early as 2006, MCGP began offering electronic bingo games at Victoryland.[8] (Compl. ¶¶ 27, 43.)  MCGP and Mr. McGregor entered into agreements with MMG, IGT, Cadillac Jack, Nova, and BGI to provide electronic bingo machines at Victoryland.[9]  (Compl. ¶ 34.)  The Manufacturers shipped the electronic bingo machines across state lines and installed them at Victoryland. (Compl. ¶ 71(c).)  The Manufacturers also supplied computer software, computer servers, mainframe computers, and other devices for the operation of the electronic bingo machines at Victoryland.  (Compl. ¶ 72.)  At the time of the Complaint, MCGP and the Manufacturers had ongoing participation agreements for the operation of the electronic bingo machines. (Compl. ¶ 71(b)(ii).)   Pursuant to these agreements, the Manufacturers controlled the computer servers running the electronic bingo games, and shared maintenance responsibility for the bingo machines with MCGP.  (Compl. ¶ 71(b)(ii).)  MCGP and Mr. McGregor

---

[7] The Complaint's facts are taken as true, but not its legal conclusions.  *See Iqbal*, 129 S. Ct. at 1949.  For example, Plaintiffs' contentions discussed in the preceding subsection, to include the contention that Amendment No. 744 "did not allow" electronic bingo machines is a legal conclusion. (Compl. ¶ 17.)  Indeed, the parties represent that the legality of the electronic bingo machines under Alabama law is at the heart of this case; however, at this stage, it is unnecessary to decide, and this opinion expresses no view on, whether the electronic bingo machines are legal under Amendment No. 744 or other Alabama laws.  That issue cannot be summarily resolved within the factual vacuum of a motion to dismiss.

[8] At Victoryland, a patron could play paper or electronic bingo or bet on parimutuel greyhound racing.  Only electronic bingo is at issue in this lawsuit.  (*See* Compl. ¶ 72 (Victoryland has "some legitimate business operations such as the conducting of paper bingo games" and parimutuel dog racing.).)

[9] The Complaint does not allege whether Victoryland obtained the electronic bingo machines by purchase, lease or some other arrangement.  This factual omission is not material, however, to resolution of the pending motions.

9

compensated the Manufacturers for their ongoing services through revenue sharing agreements.  (Compl. ¶ 72.)

MCGP is a for-profit corporation.  (Compl. ¶ 39(b).)  To conduct bingo under Amendment No. 744, MCGP paid approximately sixty nonprofit organizations for use of their bingo licenses.  (Compl. ¶ 28.)  For the years 2006 through 2009, MCGP earned more than $1 billion in gross revenues from consulting fees for the operation of electronic and paper card bingo games on behalf of these nonprofit organizations.  (Compl. ¶ 27.)  The nonprofit organizations received "substantially less."  (Compl. ¶ 28.)  For example, in 2008, MCGP paid the sixty nonprofit organizations a total of approximately $2.2 million "for the use of their bingo licenses."  (Compl. ¶ 28.)

MCGP marketed Victoryland as a "casino" that provided a "Las Vegas style gambling experience."  (Compl. ¶ 36.)  MCGP advertised that a patron could win millions of dollars by playing bingo.  (Compl. ¶ 50.)  Mr. McGregor also appeared in these marketing efforts, where he used the slogan:  "Come join us.  You could be a winner too[!]"  (Compl. ¶ 50.)

To play electronic bingo, a patron deposited money in the machine and pressed a single button.  Victory or defeat resulted from the actions of the electronic bingo machine, and not the patron's participation.  The press of the button caused electronic "wheels" to turn, similar in appearance to the reels of a slot machine.  Based on the resulting combination from the spinning "wheels," a patron's electronic bingo card was automatically daubed by the electronic machine.  This electronic bingo card was a small part of the overall presentation of the electronic bingo machines.  If the electronic "wheels" revealed a winning combination,

the patron won a cash prize.  Otherwise, the patron lost his or her wager.  Electronic bingo machines of this type dominated the business operations at Victoryland.  (Compl. ¶ 35.)

The electronic bingo machines did not require a patron to use a paper bingo card, keep pace with bingo numbers being called, recognize the bingo numbers being called, "daub" a bingo card based on the number called, call "bingo" upon arranging a winning combination, or submit the card and daubs for verification of its winning combination.  (Compl. ¶ 35.)

Each Plaintiff played the electronic bingo machines at Victoryland "on numerous occasions" and collectively spent "millions of dollars" during the twelve months preceding the filing of the Complaint.  (Compl. ¶¶ 21-22.)  While Plaintiffs did not achieve net wins, there is one player who did:  former Birmingham Mayor Larry P. Langford ("Langford"). From 2006 to as late as August 28, 2009, Mr. Langford was a frequent patron of Victoryland. (Compl. ¶¶ 42-45.)  During a portion of this period, Mr. Langford was also the mayor of Birmingham.  (Compl. ¶ 41.)   Mr. Langford experienced tremendous success playing electronic bingo.  In 2006, he won 57 bingo jackpots totaling more than $300,000.  (Compl. ¶ 43.)  In 2007, Mr. Langford won 189 bingo jackpots totaling more than $500,000.  (Compl. ¶ 43.)  In 2008, he won 302 bingo jackpots totaling more than $700,000.  (Compl. ¶ 44.)  In 2009, Mr. Langford won multiple bingo jackpots totaling more than $100,000.  (Compl. ¶ 45.)  All told, for the years 2006, 2007, 2008 and 2009, his bingo jackpots exceeded $1,600,000.  (Compl. ¶ 47.)

The only reason Mr. Langford won at Victoryland was because the electronic bingo machines he played were "programmed or rigged . . . to substantially benefit and profit

certain politicians, including [him]."  (Compl. ¶¶ 39(f), 46-47.)  With Mr. McGregor's knowledge and participation, Mr. Langford was escorted by MCGP employees to rigged electronic bingo machines, "owned and/or operated" by Defendants, where he won the aforementioned jackpots.  (Compl. ¶ 46.)  These actions were taken by MCGP and Mr. McGregor "in hopes of receiving political favor and to promote approval of their business dealings, including the approval of electronic bingo at the Birmingham Race Course in Birmingham, Alabama." (Compl. ¶ 47.)  Despite the sum of his winnings, Mr. Langford was never featured in any of MCGP's advertising for Victoryland to prevent disclosure of the substantial payoffs.[10] (Compl. ¶ 51.)  Plaintiffs allege that Mr. Langford's winnings "were political bribes and payoffs," and that "[i]n arranging jackpots for [Mr.] Langford," Mr. McGregor and MCGP "eliminated the principal requisite of bingo – that it be a game of chance . . . ."  (Compl. ¶¶ 49, 53-54.)

---

[10] Patrons who won a jackpot at Victoryland were required to participate in MCGP's marketing efforts, including use of their images and likenesses on billboards, television, and internet advertising. (Compl. ¶ 50.)  Former patrons who won bingo jackpots were featured in Victoryland advertisements. (Compl. ¶ 51.)

D.   <u>Claims</u>

Relying upon the premise that Victoryland amounts to an "illegal gambling operation" at which they incurred gambling losses (Compl. ¶¶ 12, 39), Plaintiffs filed suit on February 16, 2010, seeking to recover those gambling losses and more under the federal RICO statute and state law.  The Complaint includes three counts.  In Count I, Plaintiffs allege that they "entered into wagers" with Defendants, that those wagers were founded upon illegal gambling contracts and that, therefore, the contracts are void, pursuant to Alabama Code § 8-1-150.  As to Count I, Plaintiffs demand judgment against Defendants, "jointly and severally, for recovery of the monies paid on all electronic bingo games played by Plaintiffs in the six months next preceding the filing of this Complaint."  (Compl. ¶¶ 59-62.)

In Count II, Plaintiffs bring a claim under the Alabama Deceptive Trade Practices Act, §§ 8-19-1 to 8-19-15.  (Compl. ¶¶ 63-68.)  They contend that Defendants engaged in deceptive practices by rigging electronic devices, by representing that the electronic devices were legal, and by operating electronic bingo games "with devices" prohibited by Alabama's criminal laws and the Alabama Constitution.  (Compl. ¶ 65.)  Plaintiffs seek damages from Defendants, jointly and severally, for the "millions of dollars" of losses they incurred as a result of Defendants' deceptive practices.  (Compl. ¶ 68.)  As discussed later in this opinion, Plaintiffs no longer pursue this claim.

In Count III, Plaintiffs seek treble damages and an injunction for alleged violations of RICO, 18 U.S.C. § 1961, *et seq*.  (Compl. ¶¶ 69-76.)  Plaintiffs bring this count under 18

U.S.C. § 1964(c), arguing that Defendants violated 18 U.S.C. § 1962(c).[11]  The predicate

RICO acts rest on allegations that Defendants' involvement with electronic bingo gaming at

Victoryland violated federal and state criminal laws, to wit: (1) Ala. Code § 13A-12-53

(provider of barricaded gambling room); (2) 18 U.S.C. § 1084(a) (transmission of

information assisting in placing of bets in sporting events); (3) 18 U.S.C. § 1952 (use of

interstate facilities to further unlawful activity); (4) 18 U.S.C. § 1953 (interstate

transportation of wagering paraphernalia); (5) 18 U.S.C. § 1955 (operation of an illegal

gambling business); (6) 18 U.S.C. § 1957 (receipt of payment of more than $10,000 from

criminally derived property); and (7) Ala. Code § 13A-10-61 (bribery of public servants).

(Compl. ¶¶ 70a-g.)  The Complaint couches its ultimate allegations of RICO liability this

way:

> Defendants' conduct of the affairs of Victoryland . . . through the "pattern of
> racketeering activity" directly caused injury to the Plaintiffs.  Without
> Defendants engaging in these acts of "racketeering activity," Defendants could
> not have operated the establishment and enterprise known and advertised as
> Victoryland . . . , and without said operation, Plaintiffs would have never
> participated in the electronic games played at Victoryland . . . , and therefore,
> would never have lost money playing said games in the absence of
> Defendants' "racketeering activity."  Indeed, without the Defendants'
> engaging in racketeering activity" and violating Alabama law, the enterprise
> known as Victoryland . . . would never have been allowed to operate at all.

(Compl. ¶ 75.)

---

[11] The Complaint alleges a violation of 18 U.S.C. § 1962(2).  (Compl. ¶ 71.)  The subsections
delineated in § 1962 are (a), (b), (c) and (d).  There is no subsection (2).  Subsection (c) is the only
subsection referred to in Plaintiffs' consolidated response to the motions to dismiss.  (*See* Doc. # 80,
at 4-5.)

**IV.  DISCUSSION**

Defendants move for dismissal, pursuant to Rule 12(b)(1) and (b)(6), of all three claims in the Complaint.  *See* Fed. R. Civ. P. 12(b)(1) & (6).  Plaintiffs oppose dismissal of the RICO claim and the state law claim seeking recovery of gambling losses under § 8-1-150 of the Alabama Code; however, they do not oppose dismissal of the state law claim brought under the Alabama Deceptive Trade Practices Act.   The arguments are addressed below.

**A.    RICO (Count III)**

RICO permits a private civil action to recover treble damages for injuries suffered by reason of its substantive provisions.  Section 1962(c), which is the substantive provision Plaintiffs invoke, *see supra* note 11, provides that it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  § 1962(c).  A § 1962(c) violation requires proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (citation and internal quotation marks omitted).  These four elements "apply whether the RICO claim is civil or criminal in nature."  *Id.*

There are two additional requirements in civil RICO cases set out in § 1964(c).  These are RICO's "statutory standing" requirements.  *Id.* at 1282-83.  Section 1964(c) states that "[a]ny person injured in his business or property by reason of" RICO's substantive provisions has the right to "recover threefold the damages he sustains . . . ." § 1964(c).  Under § 1964(c),

15

civil RICO plaintiffs "must show (1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* at 1282-83. The statutory standing requirement ensures that "RICO is not expanded to provide a 'federal cause of action and treble damages to every tort plaintiff.'" *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (quoting *Oscar v. Univ. Students Co-Op Ass'n*, 956 F.2d 783, 786 (9th Cir. 1992)).

Defendants challenge Plaintiffs' RICO standing under § 1964(c) and the sufficiency of Plaintiffs' allegations of the substantive RICO violations under § 1962(c). The RICO arguments involve a number of complex issues, but it is only necessary here to address whether Plaintiffs allege facts establishing the elements of § 1964(c). For the reasons to follow, Plaintiffs cannot show that their gambling losses constitute an injury to "business or property" or that those losses occurred "by reason of" the alleged RICO violations, as required by § 1964(c). Accordingly, they cannot state a claim under RICO.

### 1.      *RICO Standing – § 1964(c)*

A brief pause is warranted here to clarify the proper standard of review for analyzing whether Plaintiffs sufficiently allege the elements of § 1964(c). Defendants cite both Rule 12(b)(1) and (b)(6), but do not specify upon which subsection of Rule 12(b) they rely for their § 1964(c) arguments. In *Williams*, the Eleventh Circuit distinguished between § 1964(c)'s "statutory standing" requirement and standing under Article III of the United States Constitution. 465 F.3d at 1291. *Williams* considered the issue of RICO standing

16

under Rule 12(b)(6), not Rule 12(b)(1).  *Id.* at 1292; *accord Hemi Group, LLC v. City of New York, N.Y.*, 130 S. Ct. 983 (2010).  This court does the same.

### a.     Injury to Business or Property

The terms "'business or property' are, in part, words of limitation."  *Grogan v. Platt*, 835 F.2d 844, 846 (11th Cir. 1988); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("The phrase 'business or property' . . . retains restrictive significance.").  Courts have excluded from the phrase's meaning "[i]njury to mere expectancy interests or to an 'intangible property interest.'"  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) (compiling cases); *see also Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086-87 (9th Cir. 2002) ("[M]ere injury to a valuable intangible property interest" is not a RICO injury.).  Rather, "[t]o demonstrate injury for RICO purposes, plaintiffs must show proof of concrete financial loss."  *Chaset*, 300 F.3d at 1086-87; *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728-29 (8th Cir. 2004) (same); *see also Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003) (A plaintiff lacks RICO standing "unless he can show concrete financial loss.").

Plaintiffs seek to recover gambling losses they incurred when they patronized Victoryland and lost wagers on allegedly illegal electronic bingo machines.  They assert that they suffered injuries in the form of illegal gambling losses.  The issue of a § 1964(c) RICO injury in the context of alleged illegal gambling losses has not been addressed by the Eleventh Circuit.  The issue has been debated in other circuits, however, and those cases have been debated in the parties' briefs.

17

One such case is *Chaset*.  *Chaset* involved an appeal in consolidated actions brought by plaintiffs who had purchased trading card packages with a chance to obtain valuable "chase" cards (also called "insert" cards).  300 F.3d at 1085-86.  The chase cards were randomly inserted in a percentage of packages, with the odds of winning a chase card typically advertised on the package.  *Id.* at 1086.  In the lower courts, the plaintiffs alleged that the "random inclusion of limited edition cards in packages of otherwise randomly assorted sports and entertainment trading cards constituted unlawful gambling in violation of RICO."  *Id.*  The defendants moved for Rule 12(b)(6) dismissal "on the ground that the plaintiffs lacked [RICO] standing because they had not suffered an injury cognizable under RICO."  *Id.*  The district court granted the motions, and the Ninth Circuit affirmed:

> Purchasers of trading cards do not suffer an injury cognizable under RICO when they do not receive an insert card.  At the time the plaintiffs purchased the package of cards, which is the time the value of the package should be determined, they received value – eight or ten cards, one of which might be an insert card – for what they paid as a purchase price.  Their disappointment upon not finding an insert card in the package is not an injury to property.  They, therefore, lack standing to sue under RICO.

*Id.* at 1087.  In reaching this conclusion, the Ninth Circuit agreed "with all other courts that have considered this issue."  *Id.* (citing, among other cases, *Price*, 138 F.3d at 602).

*Price* also involved a RICO action against a manufacturer of sports trading cards.  *See* 138 F.3d at 604-05.  Purchasers of the cards alleged that the manufacturer's marketing of the cards amounted to illegal gambling.  *Id.*  The Fifth Circuit upheld the dismissal of the complaint based upon the purchasers' failure to plead RICO standing.  It reasoned that "[i]njury to mere expectancy interests or to an 'intangible property interest' is not sufficient

18

to confer RICO standing." *Id.* at 607.  A similar conclusion was reached in *Green v. Aztar Corp.*, No. 02-C-3514, 2003 WL 22012205 (N.D. Ill. Aug. 22, 2003), where the plaintiff sought to recover illegal gambling losses under RICO from casinos.  In *Green*, the claim failed under § 1964(c) because

> [w]hen [the plaintiff] decided to gamble, he paid for (and received) the opportunity to win.  When that chance did not pay off, it did not mean that he suffered a RICO property loss however.  [The plaintiff's] disappointment at not winning his bets does not constitute an 'injury to property' sufficient to confer RICO standing.

*Id.* at *2.  A voluntary participant in gaming activities is an "independent actor," and any "gambling losses are nothing more than self-inflicted wounds."  *Id.* at *3.  "[P]rivate plaintiffs alleging injuries resulting from their own gambling cannot establish 'injury to business or property' under RICO."  *Id.* at *2.

Based upon the foregoing cases, Plaintiffs concede that illegal gambling losses *alone* do not suffice to show injury to property under RICO.  Plaintiffs argue that they "have alleged *more* than just illegal gambling losses."  (Doc. # 80, at 31) (emphasis added).)  This line of argument also is not persuasive.

First, a large part of that "more" is devoted to a discussion of the multiple alleged "*predicate act* violations" of state and federal criminal laws.  (Doc. # 80, at 27-31 (emphasis added).)  Plaintiffs incorrectly equate a demonstration of predicate acts with a demonstration of injury to business or property.  While the substantive elements of a RICO claim require a pattern of racketeering activity involving at least two predicate acts, the issue of RICO standing is a separate and distinct inquiry.  *See Williams*, 465 F.3d at 1283 (delineating

19

elements of a civil RICO claim).  Along the same lines, a number of courts have rejected arguments made by plaintiffs that the alleged illegality of the gambling transaction under state law translated into a RICO injury to property.  As aptly observed by the district court in one of the cases consolidated for appeal in *Chaset* (and affirmed), "[s]tate law may proscribe gambling irrespective of whether or not it causes injury to business or property of persons within the meaning of § 1964(c)."  *Rodriguez v. Topps Co., Inc.*, 104 F. Supp. 2d 1224, 1227 (S. D. Cal. 2000); *see also Price*, 138 F.3d at 607 ("[I]t does not follow that any injury for which a plaintiff might assert a state law claim is necessarily sufficient to establish a claim under RICO."); *Major League Baseball Props., Inc. v. Price*, 105 F. Supp. 2d 46, 51-52 (E.D.N.Y. 2000) ("The illegality and voidness of the gambling transaction [under state law] does not change th[e] fact" that the trading card purchaser paid for a bona fide chance to win a chase card and, thus, suffered no RICO property injury.).  Hence, even if the chance to win that Plaintiffs paid for was illegal under state law, such illegality in and of itself would not transform Plaintiffs' gambling losses into civil RICO property losses.

Second, Plaintiffs argue that they allege "more" based upon an exception noted in *Rodriquez.*  In *Rodriquez*, the court pointed out that there were no allegations of "fraud or dishonesty with respect to [the d]efendant's gambling activity," or that the defendant had "engaged in any sort of fraudulent or dishonest conduct such as misrepresenting to purchasers the odds of winning a chase card."  104 F. Supp. 2d at 1226-27.  It opined that a "lost opportunity to win" could constitute a property injury under § 1964(c) in the case of "a 'rigged' or fraudulent gambling mechanism."  *Id.* at 1226.  Likewise, in *Green*, the court

noted that the plaintiff "appear[ed] to mistakenly equate property interest (*i.e.* the consideration tendered during a gambling act) with property injury (*i.e.* lost opportunity to win as would be the case, for example, with a 'rigged' or fraudulent gambling mechanism)." 2003 WL 22012205, at *2 n.1; *see also Schwartz v. Upper Deck Co.*, 104 F. Supp. 2d 1228, 1230 (S.D. Cal. 2000) ("Plaintiffs must show that they have suffered an economic harm to business or personal property that would constitute the sort of injury contemplated under § 1964(c) as, for example, in the case of a fraudulent gambling scheme."), *aff'd, Chaset,* 300 F.3d 1083 (9th Cir. 2002)); *see also Price*, 105 F. Supp. 2d at 52 (recognizing the important issue is "whether the activity is run fairly and honestly" and noting that plaintiffs did not "suffer[ ] property injury from unfair or dishonest conduct").  In the foregoing cases, the courts hypothesized that a RICO injury may have existed had there been allegations that the gambling activity engaged in by the plaintiff was manipulated such that he or she did not in fact receive the chance to win that was purchased.

Plaintiffs contend that they adequately plead "allegations of fraud or dishonesty regarding Defendants' illegal gambling operation," and that "Defendants' illegal gambling operation is founded on fraudulent, dishonest, rigged and manipulated games and gambling devices."  (Doc. # 80, at 32.)  The court disagrees that the hypothetical noted above can be extended to Plaintiffs' set of the facts because they fail to plead facts connecting the alleged rigging of any electronic bingo machine (*i.e.*, the alleged fraudulent and dishonest conduct) to an injury suffered by them.  It is true that Plaintiffs allege that, as political payoffs orchestrated by Mr. McGregor, certain electronic bingo machines at Victoryland were rigged

"to substantially benefit" and "confer money" upon Mr. Langford.  (Compl. ¶¶ 39f, 70g.)

Namely, it is alleged that Mr. Langford was escorted to these rigged machines at different

times over a four-year period.   (Compl. ¶¶ 46, 51.)  It may be, as Plaintiffs allege, that the

element of chance was eliminated on the electronic bingo machines Mr. Langford played so

as to guarantee that he would "be a winner too" of more than $1 million. (Compl. ¶ 50.)  The

specific allegations as to machine rigging, however, begin and end with Mr. Langford.  None

of the allegations extend to Plaintiffs' play, as noted below.[12]  No Plaintiff alleges that he or

she played a machine that was rigged to foreclose a payout.  In fact, there are no allegations

that any electronic bingo machine was rigged so as to guarantee no or insubstantial payouts.

The only machine rigging alleged is rigging for a third party (*i.e.*, Mr. Langford) and rigging

that guaranteed a substantial payout for that third party.  There are no allegations connecting

the alleged rigging to any particular electronic bingo machine played by Plaintiffs.

Plaintiffs do allege that, during the same "time frame" that Mr. Langford gambled on

rigged electronic bingo machines, Plaintiffs also played electronic bingo machines at

---

[12] (*See, e.g.*, Compl. ¶ 39f. ("[M]achines have been programmed or rigged . . . to substantially benefit . . . Langford."); Compl. ¶ 46 ("Langford was escorted to particular machines" by MCGP employees where he "won . . . substantial sums as jackpots."); Compl. ¶ 47 (MCGP and Mr. McGregor "arranged for and/or allowed Langford to win more than $1,600,000."); Compl. ¶ 49 (MCGP and Mr. McGregor "arrang[ed] jackpots for Langford."); Compl. ¶ 51 (MCGP and Mr. McGregor concealed "discovery and disclosure of the substantial payoffs made to Langford."); Compl. ¶ 53 (MCGP and Mr. McGregor "were arranging for Langford to win substantial jackpots" as "political bribes and payoffs"); Compl. ¶ 70g (MCGP and Mr. McGregor "alter[ed], manipulat[ed], arrang[ed], controll[ed] and/or rigg[ed] illegal electronic gambling devices so as to confer money upon Larry P. Langford.").)

Victoryland.[13]   (Compl. ¶ 42.)   But, their claim cannot go forward solely on this bare, temporal allegation.   It does not nail down that any Plaintiff played electronic bingo on the same day when Mr. Langford won a jackpot.   However, even if temporal proximity had been narrowed to a specific day, that would not cure the pleading problem.   The more fundamental pleading flaw is that there are no allegations that the rigging of the machines for Mr. Langford's *advantage* worked to Plaintiffs' *disadvantage* and deprived them of an opportunity to win.   Plaintiffs do not allege that their odds of winning electronic bingo were adversely impacted because of the alleged game rigging for Mr. Langford.   Plaintiffs do not allege that they had no opportunity to win when they deposited money into the electronic bingo machines at Victoryland.   The Complaint fails to demonstrate how the rigging of Mr. Langford's machines (for a big jackpot) resulted in Plaintiffs winning no jackpot.

Plaintiffs, like those in *Rodriquez* and *Green*, are left only with allegations that they got exactly what they bargained for when they paid to play electronic bingo machines at Victoryland – a chance to "be a winner too."   (Compl. ¶ 50.)   There are no allegations that lead to any other conclusion but that the chance was real.   In Plaintiffs' words, there was a chance that the "wheels" on the "slot machines" might align in their favor.   (Compl. ¶ 35 (explaining that when a patron plays a Victoryland electronic bingo machine, he or she "might win if a certain combination of visual 'reel' images is obtained; if not, the patron

---

[13] Mr. Langford last played an electronic bingo machine at Victoryland on August 28, 2009. (Compl. ¶ 42.)   Plaintiffs played electronic bingo machines during the twelve months preceding the filing of their Complaint (Compl. ¶ 22), which dates their play as beginning on February 16, 2009.   There is, thus, a six-month overlap when both Plaintiffs and Mr. Langford played the electronic bingo machines at Victoryland.

loses said wager").  It necessarily follows that there was a chance that Plaintiffs would lose.  The injuries about which Plaintiffs complain are not the sort of injuries contemplated under § 1964(c).[14]

As a final push for a finding of a § 1964(c) injury, Plaintiffs assert that "the totality of these Defendants' RICO violations, fraud, dishonesty and rigged and manipulated games has also resulted in Plaintiffs' having suffered an *intangible property injury* in their having been deprived of the 'right to honest services.'"  (Doc. # 80, at 32-33 (emphasis added).)  This push also falls short.

For one thing, there is an absence of a single citation to legal authority to support Plaintiffs' contention.  That is not surprising, given the clear holdings from the Fifth, Eighth and Ninth circuits that intangible property injuries are not RICO injuries.[15]  *Price,* 138 F.3d at 607 ("Injury to mere expectancy interests or to an 'intangible property interest'" is not a RICO injury to business or property.); *Chaset*, 300 F.3d at 1086-87 (same); *Regions Bank*, 387 F.3d at 728-29 (same).  Indeed, the Ninth Circuit rejected the precise argument made by Plaintiffs here when it held that "the deprivation of 'honest services' does not constitute concrete financial loss" sufficient to establish an injury on a RICO claim.  *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001).  These decisions are persuasive.

---

[14] It should be noted that the alleged liability of the Manufacturers is even more attenuated, given that Plaintiffs' allegations of machine rigging are directed only toward MCGP and Mr. McGregor, *see supra* note 12.

[15] The court is not aware of any conflicting authority from this circuit.

For another thing, there is not a single allegation in the Complaint that the complained-of RICO injury is a loss of honest services, and what is not in the complaint cannot be added in a brief. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Finally, Plaintiffs' allegations suggesting that their RICO injury is the lost opportunity to receive "fair and equal treatment" falter for the same reason. (*See* Compl. ¶ 40 ("Inherent in Constitutional Amendment 744 is a requirement of fairness and equal treatment to all bingo players through playing a game without preordained individual winners or favoritism."); Compl. ¶ 52 (Plaintiffs . . . believed . . . that they ha[d] an equal chance to win substantial jackpots to any person, including Larry Langford.").) The injuries of which Plaintiffs complain – illegal gambling losses (unaccompanied by allegations of fraud affecting their losses) and loss of honest services – do not qualify as RICO injuries to business or property.

In sum, Plaintiffs lack RICO standing, as required by § 1964(c), because they fail to allege facts demonstrating an injury to "business or property." Additionally, as discussed below, Plaintiffs also lack RICO standing because there are no allegations that their alleged illegal gambling losses were "by reason of" Defendants' alleged RICO violations.

### b.    "By Reason Of"

Section 1964(c)'s "by reason of" language requires a plaintiff to demonstrate both "but for" causation and proximate causation. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Proximate cause for purposes of RICO "requires 'some direct relation

between the injury asserted and the injurious conduct alleged.'" *Hemi Group, LLC*, 130 S. Ct. at 989 (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269. The Eleventh Circuit has instructed district courts to "scrutinize proximate causation at the pleading stage and carefully evaluate whether the injury pled was proximately caused by the claimed RICO violations." *Williams*, 465 F.3d at 1277 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)).

Defendants present two principal arguments on the issue of proximate cause. First, they contend that the generalized allegations in paragraph 75 of the Complaint establish only "but for" causation, not proximate causation. (Doc. # 72, at 17; Doc. # 73, at 17-20; Doc. # 74, at 12-15.) Second, they argue that Plaintiffs' voluntary acts of playing electronic bingo machines are intervening causes that sever the chain of causation. (Doc. # 58, at 12-13; Doc. # 62, at 6-7; Doc. # 68, at 19-20; Doc. # 73, at 19; Doc. # 74, at 14.) Plaintiffs also rely on paragraph 75 of their Complaint, in addition to paragraph 76, but assert that those allegations are "well-plead[ed]" and demonstrate proximate cause. (Doc. # 80, at 34.) Defendants have the better argument.

As noted in another context earlier, paragraph 75 of the Complaint provides:

Defendants' conduct of the affairs of Victoryland . . . through the "pattern of racketeering activity" directly caused injury to the Plaintiffs. Without Defendants engaging in these acts of "racketeering activity," Defendants could not have operated the establishment and enterprise known and advertised as Victoryland . . . , and without said operation, Plaintiffs would have never

26

participated in the electronic games played at Victoryland . . . , and therefore, would never have lost money playing said games in the absence of Defendants' "racketeering activity."   Indeed, without the Defendants' engaging in racketeering activity" and violating Alabama law, the enterprise known as Victoryland . . . would never have been allowed to operate at all.

(Compl. ¶ 75.)  Paragraph 76 provides that "Defendants agreed, expressly and/or impliedly, to form the Victoryland . . . enterprise and to conduct its affairs through a pattern of racketeering activity."  (Compl. ¶ 76.)

As to Defendants' first argument, Plaintiffs cannot satisfy the proximate cause requirement merely by alleging, as they have done, that the pattern of racketeering "directly caused" their injuries.  (Compl. ¶ 75.)  In *Hemi*, a § 1964(c) action, New York City alleged that the intentional failure of Hemi, an out-of-state online cigarette vendor, to submit to New York State (as required by state law) a report detailing information about New York City residents who had purchased its product "'directly caused' its harm."  130 S. Ct at 992.  The Court explained that the phrase "directly caused" could not sustain New York City's pleading burden because it was a "legal conclusion about proximate cause – indeed, the very legal conclusion before [the Court]."  *Id.  Hemi*'s admonition applies equally here.

Moreover, Plaintiffs' allegations following the pleaded legal conclusion – "directly caused" – are quintessential allegations of "but for" causation, and nothing more.  This point is aptly illustrated by the bracketed substitutions:

"[But for] Defendants engaging in these acts of "racketeering activity," Defendants could not have operated the establishment and enterprise known and advertised as Victoryland . . . , and [but for] said operation, Plaintiffs would have never participated in the electronic games played at Victoryland . . . , and therefore, would never have lost money playing said games in the

27

> absence of Defendants' "racketeering activity."   Indeed, [but for] the
> Defendants' engaging in racketeering activity" and violating Alabama law,
> the enterprise known as Victoryland . . . would never have been allowed to operate
> at all.

(Compl. ¶ 75 (brackets added).)   At bottom, Plaintiffs merely allege that "but for" the RICO

violations, there would have been no Victoryland and, thus, no electronic bingo machines for

Plaintiffs to play.   Under Plaintiffs' formulation of proximate cause, the result for New York

City in *Hemi* would have been very different.   No doubt in that case, "but for" Hemi's failure

to file the state-required paperwork detailing customer sales information, New York City

would have had the information it needed to collect back taxes from its residents who had

purchased the cigarettes online.   *See* 130 S. Ct. at 996 ("[N]o one denies that Hemi's

misrepresentation [*i.e.*, its intentional failure not to submit the required customer information

to the state of New York] was a 'but-for' condition of New York City's loss." (Breyer, J.,

dissenting)).   New York City's proximate cause argument failed, however, because the city's

lost revenues, *i.e.*, "the portion of the back taxes that were never collected," *id.* at 989, were

"caused directly by the customer's failure to pay their taxes," *id.* at 993, not by Hemi's

failure "to submit the required customer information to the State," *id.* at 989. Here, Plaintiffs,

like New York City, cannot show RICO standing simply by alleging that "the defendant

violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause

of [the] plaintiff's injury."   *Holmes*, 503 U.S. at 265-66.

Defendants' second argument is essentially that there is no "direct relation" between

the alleged RICO violations and Plaintiffs' gambling losses because Plaintiffs were in a

position to avoid injury altogether by not playing electronic bingo machines at Victoryland. Although the Eleventh Circuit has not considered the exact issue, Defendants point out that other courts have held that gamblers similarly positioned to Plaintiffs failed to allege RICO proximate cause based upon their voluntary gambling participation.  (Doc. # 62, at 6.) Defendants cite *Doug Grant, Inc., v. Greate Bay Casino Corp.*, 232 F.3d 173, 187-88 (3d Cir. 2000); *In re MasterCard Int'l, Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002); and *Green v. Aztar Corp.*, No. 02-C-3514, 2003 WL 22012205 (N.D. Ill. Aug. 22, 2003).

In *In re MasterCard*, the district court rejected the plaintiffs' attempt to use RICO to nullify debts incurred from internet gambling:  "Although plaintiffs cry out as victims in this case, they are in a precarious position because of their own voluntary acts of internet gambling."  132 F. Supp. 2d at 496.  "Plaintiffs' own acts of accessing the internet, locating the casinos, entering their information, and playing electronic casino games, are all intervening causes that break the chain of causation with respect to the defendants' alleged [RICO] activities, even if they were illegal." *Id.*  Affirming the district court's Rule 12(b)(6) dismissal of the RICO claim, the Fifth Circuit echoed the trial court's sentiments, concluding that the plaintiffs were "'independent actors who made a knowing and voluntary choice to engage in a course of conduct . . . .  They cannot use RICO to avoid meeting obligations they voluntarily took on."  313 F.3d at 264.

In *Doug Grant*, the Third Circuit rejected RICO claims by card-counting blackjack players who sued casinos that had implemented "countermeasures" to thwart their expertise

29

in counting cards.  232 F.3d at 177-78.  It observed in dicta that "[u]nlike an ordinary RICO victim, in this case the allegedly injured plaintiffs, *i.e.*, the players, can avoid any injury simply by walking away from the alleged wrongdoers, the casinos, by not playing blackjack in casinos."  *Id.* at 187-88.  "While this abstention would deprive them of the opportunity to enrich themselves at the casinos' expense, surely it would be difficult to characterize that lost speculative opportunity as an injury to 'business or property.'"  *Id.*  Although *Doug Grant* was speaking about RICO's injury to business or property requirement, its observation, as noted by *Green*, also applies in the RICO proximate cause analysis.   Relying on *In re MaserCard* and *Doug Grant*, the *Green* court concluded that the plaintiff's "knowing and voluntary gambling interrupted the causal chain between defendants' alleged RICO violations and plaintiff's injuries.  Defendants cannot be held responsible for causing [the plaintiff] to lose his money.  Nothing in [the plaintiff's] complaint suggests that he was anything but an independent actor who voluntarily chose to gamble . . . ."  2003 WL 22012205, at *3.

Here, also, there are no allegations suggesting anything other than that Plaintiffs had the option of foregoing the "Las Vegas style gambling experience" at Victoryland.  (Compl. ¶ 36.)  There are no allegations that any Plaintiff was forced to seek out Victoryland or to spend their money playing the electronic bingo machines there, and Plaintiffs do not take a contrary stance in their briefs.  As in *Green*, "[n]othing in [the] complaint suggests that [the plaintiff] was anything but an independent actor who voluntarily chose to gamble away" money.  2003 WL 22012205, at *3.  Plaintiffs could have made a conscious decision not to

enter Victoryland's doors and to turn around and go home.  Instead, they chose to enter, deposit money into the electronic bingo machines and press the button that commenced the spinning of the electronic "wheels."  (Compl. ¶ 35.)  They willingly did so and took a risk that they would lose their wagers.  When they lost, they did not concomitantly win a private right of action to bring a federal RICO claim to recover those losses.  Plaintiffs' alleged gambling losses were preceded immediately by their own voluntary acts of placing wagers on the electronic bingo machines at Victoryland; their own acts of playing the electronic bingo machines are "intervening causes that break the chain of causation with respect to the defendants' alleged [RICO] activities, even if they were illegal."  *In re MasterCard*, 132 F. Supp. 2d at 496.

Based on the foregoing, Plaintiffs do not plead facts demonstrating that they suffered gambling losses "by reason of" the alleged RICO violations.  Nor do their allegations, as discussed, demonstrate an injury to business or property.  Accordingly, Count III is due to be dismissed for failure of Plaintiffs to plead RICO standing under § 1964(c).

### 2. *Substantive RICO violations – § 1962(c)*

As stated, Defendants also challenge the sufficiency of the Complaint to plead substantive RICO violations under § 1962(c).  Because Plaintiffs fail to allege RICO standing under § 1964(c), the court need not and declines to address these arguments.

## B. <u>State Law Claims (Counts I and II)</u>

### 1. *Alabama Deceptive Trade Practices Act (Count II)*

Defendants move to dismiss Plaintiffs' claim brought under the Alabama Deceptive Trade Practices Act ("ADTPA"), § 18-9-1 to § 18-9-15.  The core of their overlapping arguments is that the ADTPA claim is not ripe, that § 8-1-150 provides the exclusive remedy under Alabama law, and that Plaintiffs failed to fulfill ADTPA's statutory pre-filing requirements.  (*See, e.g.*, Doc. # 74, at 23-24.)  In their consolidated response, Plaintiffs offer no substantive argument on this claim.  (*See* Doc. # 80, at 55.)  Rather, Plaintiffs represent that they "are willing to dismiss without prejudice" their ADTPA claim and "see no need to pursue" this claim "at this time."  (Doc. # 80, at 55.)  Plaintiffs effectively have abandoned reliance on the ADTPA claim alleged in the Complaint.  *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (noting that when a party fails to offer argument on an issue, it is abandoned).  Accordingly, the ADTPA claim will be dismissed.

### 2.	*Contracts Based Upon Gambling Consideration (Count I)*

Alabama has had in place for more than 150 years a statute prohibiting the enforcement of a contract giving rise to a gambling debt.  *See* Ala. Code § 8-1-150.  Section 8-1-150(a), which is titled, "Contracts founded upon gambling consideration void; recovery of money paid or things of value delivered," provides:

> All contracts founded in whole or in part on a gambling consideration are void. Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery.

*Id.*

In Count I, Plaintiffs demand judgment against Defendants, jointly and severally, for the recovery of all "monies [they] paid to Defendants . . . for wagers on . . . illegal [electronic] bingo games" played at Victoryland during the six months preceding the filing of the Complaint, pursuant to § 8-1-150(a) of the Alabama Code.  (Compl. ¶ 61.)  The wagers, they contend, were "founded upon [illegal] gambling consideration and contracts." (Compl. ¶ 60.)  Namely, Plaintiffs allege that the machines "are illegal electronic bingo devices" under Alabama law.  (Compl. ¶ 23; *see* Doc. # 80, at 41-42 (Plaintiffs' brief explaining their theory of liability under § 8-1-150).)

Defendants argue that the § 8-1-150 count is due to be dismissed because it is not ripe and because it impermissibly alleges that Defendants are jointly and severally liable.  The Manufacturers additionally argue that there are insufficient allegations of a gambling loss directly traceable to them or of a contract between them and Plaintiffs.  Not all arguments are asserted by all Defendants, and some Defendants make their arguments through incorporation of co-Defendants' briefs.  It is assumed, however, that all arguments are made on behalf of all Defendants to whom the argument might apply.

a.    **Ripeness**[16]

Cadillac Jack, Mr. McGregor and Victoryland[17] contend that Plaintiffs' § 8-1-150 claim is not ripe because it is contingent on an event that may never occur, that event being a final adjudication from an Alabama state court that electronic bingo in Macon County is illegal under Alabama's statutes or constitution.  (Doc. # 68, at 10-13.)  They contend that "[t]o date, no Alabama Court has made any determination regarding the legality of electronic bingo in Macon County" (Doc. # 68, at 11), and that, "until the issue regarding the legality of electronic bingo has been resolved by Alabama courts" (Doc. # 68, at 10), Plaintiffs' § 8-1-150 claim fails for want of ripeness.  (*See also* Doc. # 74, at 28.)  At the same time, Defendants represent that the "potential legality of the electronic bingo machines operated at Victoryland" is currently pending in "*Jones, et al. v. Macon County Greyhound Park, Inc.*, Macon County Circuit Court, Case No. CV-2010-016."  (Doc. # 68, at 11-12.)  Citing *Jones* as support for dismissal for lack of ripeness, Defendants assert that this action is "wholly dependent upon the outcome of other litigation that is presently pending in another court [*i.e.*, in *Jones*]."  (Doc. # 68, at 12-13.)  Defendants argue that, "[i]f electronic bingo is determined to be legal in Macon County [by the *Jones* court]," they will be shielded from liability as to Plaintiffs' § 8-1-150 claim.  (Doc. # 68, at 13.)

---

[16] Because ripeness pertains to federal courts' subject matter jurisdiction, it is properly raised in a Rule 12(b)(1) motion to dismiss.  *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 807 n.8 (11th Cir. 1993).  Here, Defendants' Rule 12(b)(1) motion poses a facial, rather than a factual, attack on the allegations of the Complaint.  The analysis is, thus, similar to that under Rule 12(b)(6).  *See McElmurray*, 501 F.3d at 1251.

[17] In this section on ripeness, collective references to "Defendants" include Cadillac Jack, Mr. McGregor and Victoryland.

The parties agree that for Plaintiffs to prevail on their § 8-1-150 claim, Plaintiffs must demonstrate that the electronic bingo machines at Victoryland are "illegal" under Alabama's constitution or statutory laws. If the machines are legal under Alabama law, there is no dispute that § 8-1-150 has no application. But if the machines are illegal, redress could be appropriate if the other prerequisites of § 8-1-150 are satisfied. As expected, Plaintiffs and Defendants take opposing positions on the issue of the machines' legality. Plaintiffs contend that Amendment No. 744 does not permit bingo to be played electronically. They also argue that the machines are "slot machines," which are forms of "gambling device[s]" that are illegal in Alabama, *see* Ala. Code § 13A-12-27. (Doc. # 80, at 49, 51; Compl. ¶ 32.) On the other hand, Defendants contend that the machines are legal under the rules and regulations promulgated by the sheriff of Macon County, pursuant to the authority given him by Amendment No. 744. Those rules and regulations, according to one Defendant, define "bingo" to include "electronic, computer, or other technologically-aided bingo games."[18] (Doc. # 74, at 15.)

The ripeness doctrine, one of the "several strands of justiciability," goes "to the heart of the Article III case or controversy requirement." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010) (citation and internal quotation marks omitted). "[R]ipeness concerns the timing of the suit," *id.*, and "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes," *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir.1997). Two factors

---

[18] These rules and regulations are not part of the record.

35

govern the analysis of ripeness:  "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005).

Defendants' argument goes to the "fitness" prong.  "A case meets the first prong if it does not involve uncertain or contingent events that may not occur at all (or may not occur as anticipated)." *Chavez ex rel. M.C. v. N. M. Pub. Educ. Dep't*, 621 F.3d 1275, 1281 (10th Cir. 2010); *see also Muhall*, 618 F.3d at 1291 ("The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." (citation and internal quotation marks omitted)).

The outcome of Defendants' argument no doubt is appealing – promotion of comity between state and federal judicial tribunals and avoidance of federal intrusion into matters of state law not yet reviewed by the state's highest court.  But, Defendants do not persuade the court that their ripeness argument is the right path for reaching the requested end.  It may be true that whether the electronic bingo machines at issue are legal under Alabama law presents a novel or unsettled issue of state law, but that novelty does not mean that the claim is not ripe.  Defendants, in effect, ask this court to find that a federal court is prohibited on ripeness grounds from deciding a novel issue of state law and must dismiss an action when asked to do so.  No authority has been cited, and the court is aware of none, that holds that a federal action is unripe merely because there exists an uncertainty about state law that is material to providing relief in a federal action.  To the contrary, there is clear authority that

the obligation of a federal court to adjudicate claims which fall within its jurisdiction is "virtually unflagging." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989). And, it is well established that when a federal court applies a state's substantive law and the state's highest court has not spoken on the issue at hand, the federal court "must predict how the highest court would decide [the] case." *Molinos Valle Del Cibao, C. por A. v. Lama*, Nos. 09-11153, 09-12587, 2011 WL 651996, at *12 (11th Cir. 2011) (published); *see also Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) ("A lack of explicit [state] case law on an issue does not absolve us of our duty to decide what the state courts would hold if faced with it.").

Defendants intermingle ripeness with abstention principles. As stated, Defendants' premise rests principally on considerations of comity to Alabama state courts. Ripeness "may involve prudential considerations of 'comity to state institutions,'" but when it does it becomes "'closely mingled'" with abstention principles. *Crane v. Fauver*, 762 F.2d 325, 328 (3d Cir. 1985) (citation omitted). In *Crane*, it was not necessary to "untangle th[e] doctrinal knot," *id.* at 328; the proper end was achieved by requiring the district court to stay, rather than dismiss, the claims that were not cognizable in the related state court proceedings, *id.* at 329; *see also Planned Parenthood of Cent. N. J. v. Farmer*, 220 F.3d 127, 148 n.11 (3d Cir. 2000) (A contention that a "matter is not ripe for review because a federal court should not attempt to decipher a state statute without the benefit of interpretation by the state courts is better framed as an argument for abstention."). It would be premature to till the different fields of abstention at this time. First, no argument for application of any of the abstention

doctrines has been made; hence, the record is devoid of legal analysis. Second, Defendants provide no pleadings or other information about the *Jones* case upon which they rely as the alleged parallel state court litigation. Given these dual reasons, there is an insufficient foundation to decide whether the interest of comity would be served by abstaining for a period of time.

*Blue Cross and Blue Shield of Alabama, Inc. v. Nielsen*, 116 F.3d 1406 (11th Cir. 1997), also provides no support for dismissal based upon a lack of ripeness. Mr. McGregor and Victoryland cite *Nielsen* for its statement "that it would be irresponsible . . . not to give the Alabama Supreme Court an opportunity to decide the difficult, sensitive, and dispositive Alabama law issues presented in this appeal," *id.* at 1413. (*See* Doc. # 68, at 12.) This statement has nothing to do with ripeness. Rather, the statement is made in the context of recognizing that "[c]ertification of state law issues to state supreme courts is a valuable tool for promoting the interests of cooperative federalism." *Id.* In *Nielsen*, the Eleventh Circuit certified unsettled issues of state law to the Alabama Supreme Court. *See id.* at 1414; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997) ("Certification procedure . . . allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.").

Defendants do not ask this court to certify to the Alabama Supreme Court any issues of state law which are "determinative" of the § 8-1-150 claim and upon which there are no "clear controlling precedents in the decisions of the Supreme Court of [Alabama]." Ala. R.

App. P. 18(a) (delineating procedures for certifying questions from federal courts).  In any event, even if certification had been requested, the absence of an evidentiary or stipulated record as to exactly how the machines operated or the business arrangements under which they operated would preclude such a request at this stage.  *See, e.g., Currie v. Group Ins. Comm'n*, 290 F.3d 1, 13 (1st Cir. 2002) ("On more than one occasion, state high courts have returned certified questions unanswered, because the factual record was undeveloped on the state law question or because there was a risk that its opinion would be merely advisory." (collecting cases)).  Suffice it to say that *Nielsen* clearly does not support dismissal of Plaintiffs' § 8-1-150 count on ripeness grounds.

In further support of their contention that the § 8-1-150 claim nonetheless rests upon contingent future events, Cadillac Jack, Mr. McGregor and Victoryland cite *Lincoln House, Inc. v. Dupre*, 903 F.2d 845 (1st Cir. 1990), (*see* Doc. # 68, at 10), and *Jackson v. Sedgwick Claims Management Services, Inc.*, No. 09-11529, 2010 WL 931864 (E.D. Mich. March 11, 2010), (*see* Doc. # 74, at 16).  In *Jackson*, a RICO action, the claims were based upon an employer's alleged scheme to wrongfully deny workers' compensation benefits for on-the-job injuries.  *See* 2010 WL 931864, at *4-5.  The court found that the claims were not ripe to the extent that any plaintiff's claims for benefits were pending before the state of Michigan's Workers Compensation Disability Board.  *Id.* at *21.  *Jackson* is distinguishable because the state's Workers Compensation Disability Board had "exclusive jurisdiction over the issue of entitlement to workers' compensation benefits."  *Id.* at *14.  Here, exclusive jurisdiction over the state law claim does not lie with the state court.

In *Dupre*, "the only injury alleged by [the plaintiff] [was] its hypothetical inability to recover from [the defendant], *if* [the plaintiff] obtain[ed] a judgment, in some amount, in the pending state court breach of contract action."   903 F.2d at 847; *see also id.* at 847 n.2 (noting that there was not an independent claim alleged that the defendant broke the contract).   *Dupre* boiled down to an anticipatory indemnification or contribution claim brought prior to the resolution of the separate suit for liability.   It is true that, typically, contribution and indemnity suits brought in anticipation of liability are not ripe until the obligation to pay in the underlying separate suit has been established by a judgment or settlement.   At least one court has relied upon *Dupre* for that very proposition.   *See Hecht v. Summerlin Life & Health Ins. Co.*, 536 F. Supp. 2d 1236, 1241 (D. Nev. 2008) (citing *Dupre* for support that "courts often find claims for indemnification or contribution are not ripe because the claims are contingent on a finding of liability on the underlying claim"). But, it is hard to envision how *Dupre* and the other similar cases cited by Defendants apply here.   Plaintiffs do not bring an indemnity or contribution action premised on potential liability in a separate pending state court action, as in *Dupre*.   Defendants also do not articulate any way in which *Dupre* is analogous to this case.   Indeed, Defendants provide no analysis whatsoever of *Dupre*.

No persuasive argument or relevant analogy having been presented by Defendants, the court declines to dismiss the § 8-1-150 count as not ripe for adjudication.

### b.     Joint and Several Liability

Plaintiffs sue Defendants jointly and severally for damages under § 8-1-150.  (*See* Compl. at 29-30.)  Defendants contend that there is no joint and several liability under § 8-1-150, relying principally upon *Motlow v. Johnson*, 39 So. 710 (Ala. 1905).  (Doc. # 62, at 11; Doc. # 68, at 9; Doc. # 72, at 24; Doc. # 73, at 24; Doc. # 74, at 29-30.)  They suggest that the entire § 8-1-150 claim is due to be dismissed because joint and several liability is alleged.  The court disagrees.

*Motlow* involved a bet placed on the result of an election for county probate judge. *See* 39 So. at 710.  The loser of the bet sued his victorious opponent and a second individual, who held the bet money as a stakeholder until the election was over.  The stakeholder, unbeknownst to the plaintiff, had fronted some of the bet money to the plaintiff's betting opponent.  *See id.*  Judgment by the lower court was entered in favor of the plaintiff, and against the two defendants jointly for the amount of the plaintiff's bet.  *See id.*  The issue on appeal was whether the defendants could be found jointly liable to the plaintiff under the predecessor to § 8-1-150.[19]  *See id.* at 711.  The Alabama Supreme Court held that, "under the facts" adduced, the plaintiff could "recover against [the stakeholder] for the amount received by him of the winnings," but no more.  *Id.*  It reasoned that because the purpose of the statute was to "put the parties *in statu quo* as to all money won or lost," to allow the

---

[19] The predecessor statute similarly provided that "[a]ny person who has paid any money, or delivered any thing of value, lost upon any game or wager may recover such money, thing or its value, by action commenced within six months from the time of such payment or delivery."  *Motlow*, 39 So. at 711 (citation and internal quotation marks omitted).

plaintiff to "recover of the defendants jointly the whole amount lost would be allowing the plaintiff to recover of [the stakeholder] money that was never received by him[;] such a judgment would not place or leave [the stakeholder] *in statu quo*." *Id.* The *Motlow* court also held that the evidence did not substantiate the plaintiff's conspiracy theory or a theory that the defendants had a "joint interest in all the winnings," such as when two gamblers scheme against a third-party victim to "pluck[ ]" the victim and split the winnings; hence, the evidence did not fall within the cited authorities permitting joint liability. *Id.* Accordingly, the Alabama Supreme Court held that "under the facts of the case," the plaintiff could not "maintain the action against the defendants jointly." *Id.*

*Motlow* does not command dismissal of the § 8-1-150 claim for at least two reasons. First, it does not stand for the principle that the entire claim should be extinguished if a plaintiff demands that any § 8-1-150 judgment be paid jointly and severally by the defendants. Whether defendants are jointly and severally liable is more appropriately a question of remedy, rather than an element of the claim. Second, *Motlow* stood in a different posture than this case. The holding was made based upon the *evidence* underlying the final judgment, not based upon the pleadings at the motion to dismiss stage. Absent any authority from Defendants establishing to the contrary, on this record, the court declines to decide the issue of joint and several liability within the limited framework of a motion to dismiss. This ruling does not preclude Defendants from reasserting the issue after the development of an evidentiary record.

42

c.      **Failure to Plead a Plausible Claim for Relief Against the**
**Manufacturers**

The Manufacturers also challenge the adequacy of the allegations supporting the
§ 8-1-150 claim.  The Manufacturers contend that Plaintiffs are required to do more "than
generally allege a collective right of recovery from Defendants generically."  (Doc. # 82,
at 10.)  They argue that there are no specific allegations that Plaintiffs lost money playing an
electronic bingo machine supplied by any particular Manufacturer, that any Manufacturer
received money lost by a Plaintiff on one of its electronic machines, or that directly connect
each Manufacturer with money lost by Plaintiffs.  (Doc. # 58, at 33-35; Doc. # 62, at 11-12;
Doc. # 72, at 25-26; Doc. # 73, at 25-26; Doc. # 74, at 30-31.)  The Manufacturers allege that
under Plaintiffs' allegations, it is equally plausible or possible that Plaintiffs' losses occurred
on an electronic bingo machine supplied by another Manufacturer.  (Doc. # 62, at 12; Doc.
# 72, at 26.)  For example, BGI's argument, which is representative, goes like this: "Because
no allegation of the Complaint makes it more likely that a given plaintiff incurred losses on
BGI-supplied equipment than on other equipment, no individual [P]laintiff's 'right to relief'
rises 'above the speculative level . . . .'"  (Doc. # 73, at 26 (quoting *Twombly*, 550 U.S.
at 555, 570); *see also* Doc. # 74, at 31.)  In short, Defendants contend that under *Twombly*,
there is no plausible claim for relief from any Manufacturer.  (Doc. # 62, at 12; Doc. # 72,
at 25; Doc. # 73, at 25-26; Doc. # 74, at 31.)

The Manufacturers' arguments are colorable, but not meritorious.  First, the
Complaint pleads more than a collective right of recovery.  There are allegations that

Plaintiffs played electronic bingo machines that were owned and/or operated by *each* Manufacturer.[20] (Compl. ¶ 21 (listing Defendants).) There also are allegations that Plaintiffs entered into wagers with *each* Manufacturer, "MMG, IGT, Cadillac [Jack], . . . Nova and [BGI]," when they played the Manufacturers' electronic bingo machines. (Compl. ¶ 60.) Furthermore, Plaintiffs allege that they lost those wagers and paid their losses to MMG, IGT, Cadillac Jack, Nova, and BGI. (Compl. ¶ 61.) Even if these facts fall at the lesser end of the descriptive continuum, they sufficiently demonstrate wagers placed and lost on the Manufacturers' electronic bingo machines and wagers paid to the Manufacturers. The alternative explanation offered by each Manufacturer (*i.e.*, that the machine played was not "mine") is not so obvious and overwhelming as to render the claim no longer plausible.

Second, Plaintiffs contend that information pertaining to the specific amount of losses each Plaintiff incurred on a particular machine and the manufacturer of that machine is exclusively within the Manufacturer's possession. (Doc. # 80, at 43-45.) As this court has recognized, "[n]o plaintiff could be expected to allege facts of which only the defendants have knowledge and control." *Hollingsworth v. Edgar*, No. 2:04cv935-WKW, 2006 WL 2009104, at *7 (M.D. Ala. July 18, 2006); *cf. Endo v. Albertine*, 812 F. Supp. 1479, 1497 (N.D. Ill. 1993) (rejecting the argument that the complaint "impermissibly 'lump[ed] the defendants together" and finding that to satisfy Rule 9(b), the "[p]laintiffs need not allege facts which are in the exclusive knowledge or control of the defendants"). Given Plaintiffs'

---

[20] No Manufacturer alleges that its electronic bingo machines were not present and available for play at Victoryland during the relevant time period.

representation, a more precise factual description would require them to have knowledge of information possessed only by Defendants.

Third, dismissal is not appropriate based upon the argument that the Complaint does not specify "how much money was retained by each individual Defendant from each individual Plaintiff." (Doc. # 62, at 11 (citations to authority include *Funliner of Ala., L.L.C. v. Pickard*, 873 So. 2d 198 (Ala. 2003)). This argument steps into the realm of proof, not pleading. *Funliner* supports, rather than contradicts, this point. *See* 873 So. 2d at 209 (finding class certification inappropriate and observing that under § 8-1-150, "in order *to recover* the plaintiffs must establish, on an individual basis, the amount they lost to the defendants." (emphasis added)); *see also Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1226 (7th Cir. 1995) ("A plaintiff is not required to itemize his damages claims in his complaint."). In any event, at least two Manufacturers recognize, and appropriately so, that the "specific amount" of the gambling losses attributable to each Manufacturer does not have to be alleged in the Complaint. (Doc. # 82, at 9; Doc. # 83, at 1.)

Based upon the foregoing, the Complaint pleads a plausible claim for relief under § 8-1-150. Dismissal for failure to plead a plausible claim is not warranted.

### d.    Failure to Allege a Contract Between Plaintiffs and the Manufacturers

MMG also argues that Plaintiffs fail to sufficiently allege the existence of a contract between any Plaintiff and a Manufacturer. (Doc. # 58, at 31-33; *see also* Doc. # 62, at 11-12 (IGT's brief).) MMG contends that the "Alabama Supreme Court has recognized the existence of a gaming contract *only* between the patron and the casino." (Doc. # 58, at 32.)

45

For this contention, MMG relies upon *Macon County Greyhound Park, Inc. v. Knowles*, 39 So. 3d 100 (Ala. 2009), and *Knowles*'s observation that "the general rule is that '[c]asino-style wagering is essentially an *adhesion* contract between the casino and its patrons,' that is, 'the casino defines the terms of the contract (the rules of the wager) and allows patrons to play the game as-is, with *no possibility of changing the rules*.'" *Id.* at 110 (quoting Anthony Cabot & Robert Hannum, *Advantage Play and Commercial Casinos*, 74 Miss. L.J. 681, 722 (2005)).

In *Knowles*, the plaintiff brought a breach of contract claim against MCGP for its failure to pay her a multimillion dollar jackpot allegedly won playing electronic bingo at Victoryland. *Id.* at 106. The issue in *Knowles* was not who can and cannot be a party to a casino-style gaming contract. That issue was not explored. Nor was the alleged manufacturer of the electronic bingo machine even a defendant. *See id.* at 104, 106. Rather, the issue was whether the terms of a gambling contract between the sole Defendant, MCGP, and its patron encompassed the rules of the wager incorporated into the help screens and pay tables of the electronic bingo machine (as argued by MCGP), or only the sheriff's regulations (as argued by the plaintiff).[21] *See id.* at 106. MMG's reliance on *Knowles* for the contention that there are no plausible facts upon which a "[m]achine manufacturer, such as [MMG]," can be a party to a casino-style wagering contract is not persuasive. (Doc. # 58, at 33.)

---

[21] In *Knowles*, "the *parties agree[d]* that Amendment No. 744 remove[d] impediments to the enforceability of th[e] contract." 39 So. 3d at 107 (emphasis in original). Hence, the court "express[ed] no opinion as to whether Amendment No. 744 *actually does* authorize the type of activity here involved [*i.e.*, the play of electronic bingo machines at Victoryland]." *Id.* at 107 n.1.

Absent further legal analysis and given that a wagering contract between Plaintiffs and the Manufacturers is alleged, the Rule 12(b)(6) motion for dismissal will be denied. Whether MMG and the other Manufacturers of the electronic bingo machines are proper parties to a § 8-1-150 claim can be better addressed on an evidentiary record.

## C.   **Improper Joinder**

MMG brings an additional argument that warrants brief mention here. It contends that the Complaint "should . . . be dismissed for improper joinder" because Plaintiffs' claims are "based on numerous separate transactions," and "not the 'same transaction or occurrence,'" as required by Rule 20(a) of the Federal Rules of Civil Procedure. (Doc. # 58, at 35-37.)

MMG's legal basis for requesting dismissal for improper joinder is unclear. MMG's motion is premised solely on Rule 12(b)(6), (*see* Doc. # 58, at 6 n.3); however, Rule 12(b)(6) does not use that nomenclature, and Rule 12(b) contains no provision for asserting a defense of "improper joinder" by motion. *See* Fed. R. Civ. P. 12(b). No legal authority has been cited by MMG that permits dismissal of a complaint on the grounds asserted. To the contrary, Rule 21 expressly commands that "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. No other relief is requested by MMG in connection with this argument. *See* Fed. R. Civ. P. 21 (setting out remedies for misjoinder). Accordingly, MMG's motion seeking dismissal of the Complaint for improper joinder is not persuasive. The court's rejection of the relief requested should not be interpreted as expressing an opinion as to whether the joinder of 853 Plaintiffs in this action on the § 8-1-150 claim is appropriate.

47

## V.  CONCLUSION

Plaintiffs, who gambled money on electronic bingo machines at Victoryland and lost, do not have RICO standing under § 1964(c) to seek recovery of those losses.  Because the Complaint alleges that Plaintiffs received what they paid for – a chance to "be a winner too" of electronic bingo, they have not been injured in their business or property.  The Complaint also is devoid of allegations that their voluntarily-incurred gambling losses were proximately caused by Defendants' alleged racketeering activity.  The motions to dismiss the RICO claim, therefore, are due to be granted.  The motions to dismiss the Alabama Deceptive Trade Practices Act claim also are due to be granted because Plaintiffs no longer are pursuing that claim.  The motions to dismiss the § 8-1-150 claim, however, are due to be denied.  That claim goes forward.

Accordingly, it is ORDERED that the motions to dismiss, filed by Defendants Multimedia Games, Inc. (Doc. # 57), Cadillac Jack, Inc. (Doc. # 59), IGT, Inc. (Doc. # 61), Nova Gaming, LLC (Doc. # 63), Bally Gaming, Inc. (Doc. # 65), and Macon County Greyhound Park and Milton E. McGregor (Doc. # 67) are GRANTED as to the federal RICO claim (Count III) and the Alabama Deceptive Trade Practices Act claim (Count II), and DENIED as to the § 8-1-150 claim (Count I).

DONE this 31st day of March, 2011.

_____/s/ W.  Keith Watkins_____
UNITED STATES DISTRICT JUDGE